```
                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF PENNSYLVANIA

VOORHEES,                    .    Case No. 2:19-CV-01761 (JD)
                             .
          Plaintiff,         .
                             .    James A. Byrne U.S. Courthouse
     v.                      .    601 Market Street
                             .    Philadelphia, PA 19106
EDUCATIONAL COMMISSION       .
FOR FOREIGN MEDICAL          .
GRADUATES,                   .
                             .
          Defendant.         .
                             .    March 3, 2020
. . . . . . . . . . . . . ..      2:40 p.m.

          TRANSCRIPT OF HEARING ON MOTION TO DISMISS
             BEFORE HONORABLE JAN E. DUBOIS
               UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Robert Voorhees:       JAMIE L. FORD, ESQ.
                           SIDNEY L. GOLD & ASSOCIATES, PC
                           Eleven Penn Center, Suite 515
                           1835 Market Street
                           Philadelphia, PA 19103

For Educational            ANNE E. MARTINEZ, ESQ.
Commission for Foreign     SEAN R. CAULFIELD, ESQ.
Medical Graduates:         MORGAN LEWIS & BOCKIUS
                           1701 Market Street
                           Philadelphia, PA 19107


Audio Operator:

Transcriber:               UBIQUS REPORTING, INC.
                           61 Broadway, Suite 1400
                           New York, NY 10006
                           212-346-6666
                           Email: infousa@ubiqus.com



          Proceedings recorded by electronic sound
   recording, transcript produced by transcription service.
```

2

## I N D E X

|  | PAGE |
|---|---|
| **PRELIMINARY MATTERS** | 3 |

**WITNESS FOR THE PLAINTIFF**

ROBERT VOORHEES

| | |
|---|---|
| Direct Examination by Mr. Ford | 5 |
| Cross Examination by Ms. Martinez | 27 |
| Redirect Examination by Mr. Ford | 55 |

| **EXHIBITS** | **ID.** | **EVD.** |
|---|---|---|
| J-A  11/6/16 Engagement Letter | -- | 71 |
| J-B  11/17/16 Bankruptcy Petition | -- | 71 |
| J-C  1/10/17 Request to Convert | -- | 71 |
| J-D  1/11/17 Order Converting Chapter 13 to 7 | -- | 71 |
| J-E  1/11/17 Order Converting Chapter 13 to 7 | -- | 71 |
| J-F  1/12/17 Letter from Patricia Mayer | -- | 71 |
| J-G  Unidentified Document | -- | 71 |
| J-H  1/26/17 Amended Schedules | -- | 71 |
| J-I  Unidentified Document | -- | 71 |
| J-J  3/21/17 Discrimination Charge | -- | 71 |
| J-K  10/18/17 Amended Discrimination Charge | -- | 71 |
| J-L  Complaint | -- | 71 |
| J-M  1/31/17 Letter from Spielberger Law Group | -- | 71 |
| J-N  2/27/17 Final Decree of Bankruptcy | -- | 71 |

**CLOSING STATEMENTS**

| | |
|---|---|
| By Ms. Martinez | 69 |
| By Ms. Ford | 78 |

 1               THE COURT:  Good afternoon, everyone.

 2               MULTIPLE VOICES:  Good afternoon, Your Honor.

 3               THE COURT:  Thank you.  Be seated, please.  I call

 4    the case of Robert Voorhees versus Educational Commission for

 5    Foreign Medical Graduates, civil action number 19-1761.  We

 6    scheduled a hearing today on Defendant's motion to dismiss.

 7    The issue to be addressed is one of judicial estoppel.  Is the

 8    Plaintiff ready to proceed?

 9               MS. FORD:  Yes, Your Honor.

10               THE COURT:  Is the Defense ready to proceed?

11               MS. MARTINEZ:  Yes, Your Honor.

12               THE COURT:  All right.  I'll hear from -- it may be

13    best to hear from the Defense first, to put everything in

14    perspective, and then hear from the Plaintiff.

15               MS. MARTINEZ:  Sure.  Your Honor, our understanding

16    today was that you wanted to have an evidentiary hearing.

17               THE COURT:  Yes.

18               MS. MARTINEZ:  So did you want us to call the

19    Plaintiff forward, so that we can question him?  Or would you

20    like us to give us an opening statement?

21               THE COURT:  Well, how many witnesses did you plan to

22    call?

23               MS. MARTINEZ:  We were --

24               THE COURT:  Or none?

25               MS. MARTINEZ:  Well, we thought we would be cross-

1   examining the Plaintiff because he has a rebuttable

2   presumption.

3            THE COURT:  Yes.

4            MS. MARTINEZ:  Or a rebuttable inference of bad

5   faith.  So we -- that was our understanding the purpose of

6   today's hearing, but we're happy to proceed however Your Honor

7   wished.

8            THE COURT:  No, I -- we're going to address that

9   issue and the Plaintiff has a rebuttable presumption against

10  him.  And I guess we really know enough that we don't need

11  opening statements.  It's actually a rebuttable inference.

12           MS. MARTINEZ:  Sorry.

13           THE COURT:  You were correct.  You corrected yourself

14  and I wanted to be sure.  So I change my mind.  We'll have the

15  Plaintiff go first.

16           MS. MARTINEZ:  Thank you, Your Honor.

17           THE COURT:  And to put everything in context, the

18  issue is Plaintiff's failure to amend his bankruptcy petition

19  after retaining employment counsel, and sending a demand letter

20  to the Defendant during the pendency of his bankruptcy.  He

21  filed the original Chapter 13 petition before the employment

22  discrimination came -- claim, but as the events unfolded his

23  bankruptcy proceeding wasn't terminated until after he filed

24  his claim in this court.  And so I think that creates a

25  rebuttable inference of sufficient to trigger judicial

                          Preliminary Matters                    5
1   estoppel.  Now I'll hear from Plaintiff first.

2              MS. FORD:  Yes, Your Honor. I would like to call the

3   Plaintiff, Robert Voorhees.

4              THE COURT:  You may do so.

5              MS. FORD:  Would you like him at the witness stand,

6   Your Honor.

7              THE COURT:  I would -- I want him in the witness

8   stand.  He'll be sworn.

9              COURTROOM DEPUTY:  Please raise your right hand.  Do

10  you swear or affirm the testimony you shall give to this Court

11  shall be the truth, the whole truth, nothing but the truth, so

12  help you god?  Or you so affirm?

13             MR. ROBERT VOORHEES:  I do.  I affirm.

14             COURTROOM DEPUTY:  Thank you.  Please be seated.

15  Please state your name for the record.

16             MR. VOORHEES:  My name is Robert Skylar Voorhees.

17             MS. FORD:  Your Honor, both Plaintiff and Defense

18  have exhibit binders for Your Honor to follow along.  And I'd

19  also like to put one at the witness stand with your permission.

20             THE COURT:  You may.

21             MS. FORD:  Thank you.

22                      ROBERT VOORHEES, PLAINTIFF, SWORN

23  DIRECT EXAMINATION

24  BY MS. FORD:

25  Q    All right.  Good afternoon, Mr. Voorhees.

Voorhees - Direct/Ford                          6

1   A    Hi.  How are you?

2   Q    I'm well.  How are you?

3   A    Good, thanks.

4   Q    You know me.  I -- my name is Jamie Ford.  I represent you

5   in the action that you filed against ECFMG, the Defendant in

6   this matter.  We're here today because the Defendant has filed

7   a motion to dismiss on your claim, and we're going to go

8   through some evidence relating to your bankruptcy proceeding

9   and your filing of the current action.  Do you understand that?

10  A    Yes.

11  Q    Did you retain legal counsel to assist you with filing for

12  bankruptcy?

13  A    Yes.

14  Q    And do you recall when you first consulted with bankruptcy

15  counsel?

16  A    That would have been in October of 2016, I believe.  Yeah.

17  Q    Can you give a brief background of what caused you to

18  consult with bankruptcy counsel at that time?

19  A    Well, I had -- I had a lot of debt, much of which was part

20  of what I had assumed after my divorce, and additional debt

21  that I had accrued after my father's death.

22  Q    And when did you -- when was your bankruptcy final?  Or,

23  I'm sorry, your divorce finalized?

24  A    On December 11th of 2014.

25  Q    As an -- is it accurate that your divorce left you with a

                         Voorhees - Direct/Ford              7

1   fair amount of debt, which is what caused you to seek potential

2   bankruptcy counsel?

3   A    Well, when I -- yes, when I was divorced, it wasn't a --

4   it was a mediated divorce.  The -- all of the assets, the house

5   especially, had been paid off and I really didn't want to -- I

6   didn't want to do any harm to anyone financially.  So the house

7   went to my wife.  I signed off on that.  And I also agreed to -

8   - since we had dual credit cards, I agreed to take over that

9   debt as well.  Some debt I was aware of.  Some I was not aware

10  of.  After my father died in 2015 -- there are three of us in

11  the family, three siblings including me.  My older sister was

12  the POA and she essentially went off the grid.  She took -- my

13  father had left equal parts to us.  Not, not much.  He didn't -

14  - he wasn't a rich man, wealthy man, but he had left some

15  things to us.  And so I had accrued some additional debt

16  through attorneys in trying to get the will probated through

17  the Mercer County Surrogated Court.

18  Q    And at some point did you formally retain legal counsel to

19  assist in your bankruptcy?

20  A    Yes.

21  Q    Do you recall when you retained counsel?

22  A    Yes.  It was early November.  I think it was around first

23  week of November, 4th or 5th, something like that.

24           THE COURT:  That's November 2016?

25           THE WITNESS:  Yes, sir.  Yes, Your Honor.  I'm sorry.

1                   THE COURT:  Thank you.

2   Q    I'd like to direct your attention to the exhibit that is

3   marked A in the binder in front of you.

4                   MS. FORD:  Your Honor, would you like me to formally

5   admit these documents into evidence?

6                   THE COURT:  Yes.  The answer is yes.  You should

7   proceed as -- I, I don't know if there's an objection.  Are

8   there any objections to any of the Plaintiff's exhibits?

9                   MS. MARTINEZ:  No, there's not, Your Honor.  We had

10  an opportunity to review them before starting today.

11                  THE COURT:  Well, then we can streamline the

12  proceedings and you can move them into evidence without laying

13  a foundation first.  And lay the foundation after they've been

14  moved, and I'll receive them in evidence.

15                  MS. FORD:  Okay, Your Honor.  In that case, I would

16  move to admit Exhibits A through N in the exhibit binder into

17  evidence.

18                  THE COURT:  A through N?

19                  MS. FORD:  Just so you know, Your Honor, there is not

20  a tab for L, M, and N.  They are simply labeled in the back.

21  They're additions by the Defense but they are in this binder.

22                  THE COURT:  Are they Plaintiff's exhibits or Defense

23  exhibits?

24                  MS. FORD:  They're joint exhibits.  Both of us will

25  be using them today.

1                THE COURT:  All right.  Well, Exhibits A through N,

2   which is what you've moved in evidence, are received in

3   evidence.

4   Q    So, Mr. Voorhees, if you take a look at Exhibit A in the

5   binder, is this an accurate copy of the engagement letter that

6   you signed with you bankruptcy lawyer?

7                THE WITNESS:  Your Honor, may I --

8                THE COURT:  You may.

9                THE WITNESS:   -- put on my glasses, please?

10               THE COURT:  Pardon me?

11               THE WITNESS:  Can I --

12               THE COURT:  Oh, absolutely.

13               THE WITNESS:  Okay.

14  A    Yes.  Yes.

15  Q    And it looks like you signed this engagement letter on

16  November 6th of 2016?

17  A    Yes.

18  Q    And at the time that you retained bankruptcy counsel did

19  your counsel advise filing for any particular type of

20  bankruptcy?

21  A    Yes.

22  Q    Okay.  What type of bankruptcy did they advise?

23  A    Chapter 13.

24  Q    And prior to consulting with bankruptcy counsel, did you

25  have any independent knowledge of the bankruptcy procedure,

 1  types of bankruptcy?

 2  A    No, I didn't.

 3  Q    So did you ultimately decide to take your counsel's

 4  recommendation and file for Chapter 13 bankruptcy?

 5  A    Yes, I did.

 6  Q    And did you do that on the advice of your counsel?

 7  A    Yes, I did.

 8  Q    Did your bankruptcy counsel prepare a bankruptcy petition

 9  on your behalf?

10  A    There were some forms that she had and she asked me to

11  provide documents, you know, information.

12  Q    Okay.

13  A    Yeah.

14  Q    And did she ask you to provide that -- those documents and

15  information for purposes of filing a petition?

16  A    Yes.

17  Q    Okay.  Do you recall what type of documents and

18  information she requested specifically?

19  A    Well, in, in the context of the meeting I had with her, my

20  recollection is she wanted mostly the -- two categories, what

21  my assets and liabilities were.  And she gave me some examples,

22  would be things like your -- all your credit card statements,

23  bank statements, if I had any 401(k) or other savings, and any

24  other liabilities.  Did I own a car?  So she wanted the title.

25  I had talked to her.  She wanted kind of current state, so I

1  talked to her about my dad.  So she wanted a copy of the will,

2  so that, that -- that's pretty much what she listed out that

3  she wanted from me.

4  Q    And at the time that she was requesting these documents

5  and information from you, were you employed?

6  A    Yes.

7  Q    Where were you employed at that time?

8  A    ECFMG.

9  Q    And when did you first start working for ECFMG?

10 A    It was in June, I believe June 6th of 2016.

11 Q    Okay.  And did your bankruptcy counsel actually file a

12 petition on your behalf?

13 A    Mm-hmm, yes.

14 Q    If you turn to Exhibit B in the binder, you can take a

15 moment to look through this but I would like to know if this is

16 an accurate copy of the bankruptcy petition that was filed on

17 your behalf.

18 A    It, it looks like it only because I recognize the square

19 boxes and, you know, how they're filled in and such.  Yeah.

20 Q    If you flip to -- I'm trying to -- so if you look at the

21 top of these documents you'll see the first one is labeled page

22 1 of 55.  Do you see that?

23 A    Oh, yes.  I do.

24 Q    Okay.  If you go to page 8 of 55...

25 A    Yes.

1  Q    So this appears to be a form 106-S.  Do you see that?

2  A    Yes.

3  Q    And it's a summary of your assets and liabilities, and

4  certain statistical information.  Is that right?

5  A    Yes.

6  Q    Okay.  Is it your understanding that, when your bankruptcy

7  counsel is requesting documents and information, part of that

8  was her requesting information about your assets and

9  liabilities?

10  A    Yes.

11  Q    And did your bankruptcy attorney ask you if you had any

12  pending lawsuits at that time?

13  A    I don't recall her asking me that.  She had, as I said

14  earlier, "Give me the current state."  And I asked her what --

15  had a conversation because I didn't understand 7 from the 13 at

16  that time.  I still don't understand it fully but she said,

17  "Well, you know, give me all your credit card statements," you

18  know.  And then she went through things that I had dealt with

19  every day.  And, and of course the savings plans and things

20  like that, but specific question about what was your -- about

21  discrimination complaint?

22  Q    Whether you recall your bankruptcy counsel asking if you

23  had any pending claims or lawsuits.

24  A    No, no, she didn't.

25  Q    And if you flip to page 47 of 55 --

1   A     I mean if I -- if I may just add to that?

2   Q     Sure.

3   A     Other than the fact that I was working with another

4   attorney, Mandio is -- I don't know the whole law firm name but

5   the lawyer's name was -- is Thomas Profy that I was working

6   with him on this will for my dad, and trying to get -- well, I

7   was getting his guidance about things like forensics accounting

8   and his assets.  And what my dad had indicated in his will, it

9   was a simple will.  So other than that, the rest of it was, I

10  thought, rather standard information she required, which, which

11  I had on hand.

12  Q    Okay.  And if you flip to page 47 of 55 in Exhibit B --

13           THE COURT:  Is there a specific line before we leave

14  page eight?  Is there a specific line for identifying claims by

15  the bankrupt estate?

16           MS. FORD:  Yes, Your Honor.  It is on page -- it is

17  on page 13 of 55.  And it is question number 33, claims against

18  third parties, whether or not you have filed a lawsuit or made

19  a demand for payment.

20           THE COURT:  And the number that -- I'm on page 13.

21  The paragraph number?

22           MS. FORD:  Number 33, Your Honor, second from the

23  bottom.

24           THE COURT:  Are you going to question him about that?

25           MS. FORD:  I do have a question for him about that,

1    Your Honor.

2              THE COURT:  Fine.

3    Q    If you turn -- are you on the page that we've been

4    discussing, page 13?

5    A    Yes.

6    Q    Okay.  If you look at number 33 --

7    A    Yes.

8    Q    Claims against third parties, whether or not you have

9    filed a lawsuit or made a demand for payment.  Do you see that?

10   A    Yes.

11   Q    And you checked no to that answer?

12   A    Yes, I did.

13   Q    Okay.  At the time that you completed --

14             THE COURT:   Did you discuss that?  Did you discuss

15   that question with your attorney?

16             THE WITNESS:  It was not discussed.  As I -- as I

17   mentioned, I didn't -- when I went in to see her initially, it

18   was to explore what bankruptcy was.  There were a lot of

19   different products on the market at that time that allowed you

20   to eliminate debt without bankruptcy.  So I was just kind of

21   exploring that world and I had asked her questions about what,

22   what is the 13.  What is a 7?  What are the ramifications of

23   that?  And so when I decided to retain her -- even her fees,

24   how her fees are incorporated into the -- into the whole

25   distribution or discharge or whatever it's called.  That's when

1   she listed out for me or said to me what documents she needed,

2   but the conversation of a discrimination claim was not brought

3   up because none had -- I mean I was still working at the time.

4   So it wasn't really on the radar.

5   Q    So, at that time, were you aware of any claims that you

6   may have had against third parties?

7   A    No.

8   Q    Okay.  And if --

9   A    Again, other than pursuing the will with surrogate court.

10  I had inquired about how those work and different documents

11  that I had to purchase to have access to my father's accounts,

12  etcetera, etcetera.  So other than that it was just, again, the

13  401(k) statements I might have had, any assets, savings,

14  checking, savings, and then the liabilities.

15  Q    And do you have a recollection of when the bankruptcy

16  petition that we've been looking at in Exhibit 2 was actually

17  filed with the bankruptcy court?

18  A    I don't have an exact date but I believe it was like mid-

19  November 17, something like that.

20          THE COURT:  What is the date, counsel?

21          MS. FORD:  It is November 17th of 2016, Your Honor.

22  Q    And after you signed off on the bankruptcy petition and it

23  was filed, did your counsel advise you of any requirement to

24  supplement the schedules that you filled out for the petition?

25  A    No.  She had just asked me -- Patricia had just asked me

1   for the current state.  So I do -- after that happened and I

2   had decided to proceed even with the downside of bankruptcy

3   which I'm now living with as it relates to credit, establishing

4   your credit, credit score, FICA, all that, I had basically --

5   it was in her, for her to guide to me to the next steps.  And

6   she told me generally that, "Well, there's going to be a

7   hearing with a trustee officer or something like that go over

8   this.  And just wait to hear from me."  And that was pretty

9   much it.

10  Q    Okay.  And outside of any knowledge from your bankruptcy

11  counsel were you independently aware of any obligation to

12  supplement the schedules?

13  A    No, I was never asked and I thought I -- since she had not

14  asked me to explain anything that I had submitted based on her

15  earlier request, I pretty much thought, you know -- I mean from

16  my viewpoint, I didn't even know what it took to qualify for a

17  bankruptcy.  I didn't know.  And I was working at the time.  I

18  was making a good salary, so I, I really had no idea what, what

19  was going on.  So I was doing a lot of inquiry at that point

20  and then she guided me through that process.  But after the

21  petition was -- that document was completed that you're

22  referring to, I really didn't, didn't hear much after that or

23  anything from, from her.  Certainly nothing to amend or add to

24  or etcetera, you know.

25  Q    And after your petition was filed on November 17th of

1  2016, at that time that it was filed, were you still employed

2  by ECFMG?

3  A    Yes, mm-hmm.

4  Q    And at the time that the petition was filed, were you

5  considering filing any kind of charge of discrimination or a

6  lawsuit against ECFMG?

7  A    No, I, I -- no, not at all.  I -- you know, there were

8  some rough spots going on at ECFMG, which I discussed certainly

9  that had occurred with me, but I needed a job.  I mean and it -

10 - interestingly, there were many people in the -- I worked in

11 human resources as their head of comp and benefits manager

12 title.  And I had really enjoyed the job.  So, no, I, I was

13 just trying to, you know, move forward and because I just

14 needed to stay employed in some capacity, yeah, somewhere.  So

15 I, I was there and I enjoyed the work.  I enjoyed going to

16 work.  It was a -- as I said, it was a bit rough environment at

17 that time.  I'm not going to call it --

18         THE COURT:  When did you say this?

19         THE WITNESS:  Pardon?

20         THE COURT:  You didn't say it in this proceeding.

21 You said several times, "As I said, I had employment problems."

22         THE WITNESS:  Yeah.

23         THE COURT:  What were they?

24         THE WITNESS:  Well, I was having -- the purpose were

25 comments that my, my previous or boss at the time, Betty LaHue

1  [phonetic] had -- she was the VP of HR, had made to me.

2           THE COURT:  They're not on the record in this

3  proceeding.

4           MS. FORD:  No, Your Honor.  They are in the complaint

5  in this matter but we have not delved into his underlying

6  allegations in the complaint.  If you would like me to question

7  him on those, I can.

8           THE COURT:  Only to the extent they shed light on

9  what he did and why he did it, beginning in 2016 I guess,

10 November 2016.

11          MS. FORD:  Understood.

12          THE COURT:  For example, it certainly is relevant and

13 he's referred to it, and I think in the same timeframe, that

14 he's had problems with his employer dating back to even before

15 this bankruptcy petition was filed.

16          MS. FORD:  Yes, Your Honor.  That's correct and

17 that's...

18 Q   So let me ask you this.  Prior to your bankruptcy petition

19 being filed, what specifically were the issues that you can

20 identify sitting here today that you were having with your

21 supervisor?

22 A   Comments that she made, questions that she asked me about

23 my age, that she didn't think I was that old.  And then in the

24 department itself following that -- that was in September of

25 '16.  I was a little bit taken back by that.  Questions about

1  grandchildren I think was another question.  Re -- making

2  comments to me, you know, "Forgetful Bob, Mr. Meek, you know,

3  Mr. Forgettable," you know, that kind of -- that kind of thing

4  both in private, in meetings one-on-one with her, as well as

5  group meetings.  Like instead of calling me Bob, calling me,

6  you know, Forgetful Bob or Mr. Forgettable, Mr. Forgettable,

7  that kind of thing.

8  Q     And did you complain to anyone at ECFMG?

9  A     Yeah.  Yeah, there was a director of employee relations

10  there.  The comment about the age happened on a conference trip

11  to Seattle with Betty.  And so, when I came back, this again

12  was in mid-September.  It was a pay scale conference.  I

13  reported it to Sharon Trowell, Trowell -- T-R-O-W-E-L-L, I

14  think -- who is the director of employee relations.  There was

15  another -- and then the comments Sharon also heard as well as

16  me going in and reporting them to her.

17  Q     And at the time that you reported these comments to

18  Sharon, were you contemplating filing any kind of lawsuit or

19  action against ECFMG?

20  A     No, I was looking for guidance.  I mean I, I knew -- I

21  wanted -- first of all, I didn't like it.  I was a bit

22  embarrassed by it but the question about age and grandchildren,

23  I knew was not correct, legal if you will.  And so I was asking

24  her for advice and guidance, and I wanted to relay it to

25  someone that was in the role of, you know, of helping me

1   resolve it or to work with me on it.

2   Q    Understood.  At some point after you filed your bankruptcy

3   petition did you convert your bankruptcy from Chapter 13 to

4   Chapter 7?

5   A    Yes.  That was -- yes, I did, mm-hmm.

6   Q    And did you do so on advice of your bankruptcy counsel?

7   A    Yes.  And I don't -- again, even to this day I don't

8   really know all the differences.  Although having read Chapter

9   7 which is I think like you have no income or you have little,

10  and the fact that it was January, mid-January after my

11  termination, I assumed that was one of the forces behind it,

12  but that's just me.

13  Q    And when were you terminated from ECFMG?

14  A    January 5th.

15  Q    Okay.  Do you recall --

16  A    Of '17.

17  Q    Okay.  Do you recall when you requested to convert the

18  bankruptcy from Chapter 7 to Chapter 13?

19  A    It was after that, January 12th, 11th or 12th, somewhere

20  in that neighborhood.  I'm not -- you know, I'm just -- I'm not

21  real keen on the dates but I -- the sequence would follow.  So

22  I think it was around the 12th of January, something like that.

23  Q    If you flip to Exhibit C in your --

24            THE COURT:  What are those dates again?  You

25  converted to a Chapter 7 --

1              THE WITNESS:  Yes.

2              THE COURT:    -- on January 13th, did you say?

3              THE WITNESS:  I said 12th, Your Honor, but --

4              MS. FORD:  The -- Your Honor, the request, the

5    petition to change from Chapter 13 to 7 was made on January

6    10th of 2017.  And that's reflected in Exhibit C in the binder.

7              THE COURT:  And you were terminated by your employer?

8              THE WITNESS:  On the 5th of January of '17.

9    Q    Did the bankruptcy judge in your bankruptcy case agree to

10   your request to convert from Chapter 13 to Chapter 7?

11   A    Yes.  I, I -- again, this was between the attorney -- yes,

12   but there was an agreement to move forward with it and to have

13   a hearing on it, I believe.  Yeah.

14             MS. FORD:  Your Honor, just for your reference,

15   Exhibit E is the order converting the bankruptcy from Chapter

16   13 to Chapter 7.

17             THE COURT:  And what's the date of that?  Is that the

18   10th?

19             MS. FORD:  That is -- the actual order is January

20   11th.

21   Q    Mr. Voorhees, you just mentioned that after you converted

22   your bankruptcy to a Chapter 7 there was a hearing held?

23   A    Yes.

24   Q    Okay.  And I believe that that --

25   A    The bank --

1  Q       -- hearing was on February 15th of 2017.

2  A     Correct, at the bankruptcy court in Trenton.

3  Q     Okay.  What do you recall was discussed during that

4  hearing?

5  A     It was a little -- first, for never having gone through it

6  before, I, I have to -- I really have to say I don't recall too

7  much of it.  It, it -- I, I do remember the courtroom was

8  packed with folks and people were being called up in fairly

9  rapid order.  And I could hear the -- whoever the trustee was,

10  or whoever that person was, asking the same questions and

11  looking at documents.  And, and that's, that's really what,

12  what I remember.  And he -- most of the conversation was with

13  counsel, except did I agree with the documents I submitted.  So

14  the whole -- my whole hearing was about the same as others.  It

15  was about five minutes.  Yeah.

16  Q     And during that hearing did you disclose any other

17  potential additional assets?

18  A     Well, yes.  I -- again, going back to my father's will, I

19  had -- my father -- well, the one thing I, I could have, which

20  my older sister couldn't access to, was a life insurance policy

21  which he had split three ways.  So that was another thing I had

22  disclosed, but that was also in the document that was

23  submitted, as it was requested earlier by my -- by my counsel

24  at that time.

25  Q     And up to the point that you had the hearing on February

1  15th of 2017, did you intentionally withhold any information

2  relating to any other potential assets?

3  A    No, no.  And to be -- you know, I, I had very -- I had

4  very little assets at that time.  I didn't have much, so there

5  was not much to withhold.

6  Q    In connection with your conversion from Chapter 13 to

7  Chapter 7, were you required to submit new schedules to the

8  petition?

9  A    Not that I'm aware of, no.

10 Q    Okay.  If you flip to Exhibit H in your binder and you

11 turn to page three of three, it's the third page of this

12 packet.  It appears that you signed this document, this

13 declaration about an individual's debtor schedules on January

14 26, 2017.  Do you see that?

15 A    Yes.

16 Q    Okay.  To the best of your recollection, this first

17 document on page one, it's entitled "Your Income."  Do you

18 believe that you amended this particular schedule because of

19 the fact that your employment had been terminated with ECFMG?

20 A    It would -- it would have been amended.  Again, my --

21 yeah, my, my income had gone to, to just -- well, I had been

22 terminated.  So other than any unemployment I would have been

23 eligible for, yes, it would have been amended.

24 Q    And ultimately were your debts discharged in bankruptcy?

25 A    Yes.

1    Q    And that order discharging your debts was on April 13th of

2    2017.  Does that sound right?

3    A    April, yes, I do remember mid-April.  Yeah, mm-hmm.

4    Q    And at any point prior to the order discharging your debts

5    were you aware of any requirement to supplement the assets and

6    liability schedules?

7    A    No.

8    Q    Did you ever have any conversations with your attorney

9    about the need to supplement your schedules?

10   A    No.

11   Q    And throughout your bankruptcy were you relying on the

12   assistance of counsel?

13   A    Totally, yes.

14   Q    Had you been aware of such a requirement to supplement,

15   would you have done so?

16   A    Of course, yes.

17   Q    When did you first retain counsel in connection with a

18   possible employment discrimination claim against ECFMG?

19   A    Well, let me -- I was terminated on January 5th of '17,

20   and it would have been pretty much at the end of that month or

21   first -- I don't know, around the 30th or 31st of January.  I

22   was looking for some guidance, again, and I needed contingency

23   because I didn't have enough money.  So, yes, that, that --

24   that's what I recollect, that it was several weeks after I had

25   been, been terminated.

1   Q    And do you recall if it was after you submitted a petition

2   to change from Chapter 13 to Chapter 7 bankruptcy that you

3   retained counsel?

4   A    Could you repeat that question, please?

5   Q    Sure.  When you first retained counsel in connection with

6   the possible claim against ECFMG --

7   A    Yeah.

8   Q    Do you recall if you retained that counsel after you had

9   petitioned to convert the bankruptcy from Chapter 13 to Chapter

10  7?

11  A    Yes, mm-hmm.

12  Q    Is that a yes?

13  A    Yes.

14  Q    Okay.

15  A    Sorry.

16  Q    And when did you first file a charge of discrimination

17  with the Pennsylvania Human Relations Commission?

18  A    Well, just going in sequence, I do -- Spielberger I

19  believe was the name of the firm.  They were located out of

20  Florida.  And that was late January, so I believe it was in

21  March.  I'm, I'm taking a shot here, mid-March, somewhere in

22  that neighborhood.  Again, I'm sorry.  March 20th, March 19th,

23  I don't know.  Something like that.

24  Q    If you turn to Exhibit A in your exhibit -- or, I'm sorry,

25  Exhibit J in your exhibit binder, is that an accurate copy of

1   the charge of discrimination that was filed on your behalf with

2   the --

3   A    Yeah.

4   Q      -- Pennsylvania Human Relations Commission?

5   A    Yes.  March 21st, yeah, mm-hmm.

6   Q    And at some point did you file an amended charge of

7   discrimination?

8   A    Yes.

9   Q    And was that after you retained Sidney L. Gold and

10  Associates to represent you?

11  A    Yes.  May I elaborate just, just a bit?  I, I --

12  Q    Sure.

13  A    I was -- I found Spielberger through Google search, looked

14  a little -- looked a little bit on Avvo, and had, you know,

15  retained them on a contingency basis.  I think they wanted a

16  $500 deposit or something like that.  In any case, I really

17  hadn't heard anything from them.  And so I went back to see if

18  there might be somebody that might be able to expedite and

19  somebody that might be familiar with Philadelphia and

20  Pennsylvania.  And so that's when I found Sidney Gold.

21  Q    If you turn to Exhibit K in the binder, is that an

22  accurate copy of the amended charge of discrimination that was

23  filed on your behalf by our firm?

24  A    Yes.

25  Q    And that was filed on October 18th of 2017?

1   A    Yes.

2   Q    And that amended charge was filed about six months after

3   you -- an order had been entered discharging your debts, right?

4   A    Yes.

5   Q    Mr. Voorhees, did you have any intention to purposefully

6   withhold information from the bankruptcy court relating to your

7   claims against ECFMG?

8   A    No, not at all.

9   Q    And, if possible, would you reopen the bankruptcy

10  proceedings to disclose your claims against ECFMG?

11  A    Absolutely.

12          MS. FORD:  I have nothing further.

13  CROSS EXAMINATION

14  BY MS MARTINEZ:

15  Q    Good afternoon, Mr. Voorhees.

16  A    Hello.

17  Q    My name is Anne Martinez.  I'm an attorney with Morgan

18  Lewis and Bockius, and our law firm has been retained to

19  represent ECFMG in this lawsuit.

20  A    Yes.

21  Q    And I'm going to have some follow-up questions for you.

22  A    Sure.

23  Q    When you worked for ECFMG, you were in the human resources

24  department.  Is that correct?

25  A    Yes.

1   Q    And before you had worked for ECFM -- ECFMG, how long had

2   you worked in the HR field?

3   A    Well, that was 2016.  I started -- if I can just take a

4   moment?  I had graduated from college in 1976 and I had worked

5   in the worker's comp field for two years following that.  So I

6   would have to say '78, 1978.  So, you know, 22, 38 years, 30

7   some years.

8   Q    And some of your HR roles before working for ECFMG had

9   included HR manager roles, correct?

10  A    Yes.

11  Q    And in those roles you oversaw HR related training such as

12  anti-discrimination training.  Is that correct?

13  A    Of course, yes.

14  Q    And in those HR jobs that you held before ECFMG, had you

15  helped to create or revise any anti-discrimination or anti-

16  retaliation policies?

17  A    Yes.

18  Q    And in your various HR jobs, were you also responsible for

19  enforcing the various companies anti-discrimination, anti-

20  retaliation policies?

21  A    Enforcing?  Well, we always used counsel, whether it was

22  internal or, or external, but yes.  I was -- I was the contact

23  point.

24  Q    And during any of your HR jobs did any of the employees

25  for the companies for which you worked file any claims of

1    discrimination or retaliation that you recall?

2    A    Most of the claims that I investigated were related to

3    sexual harassment.  There were a couple of EEO claims for

4    compensation, nonexempt, nonexempt pay for exempt positions.

5    But, yes, there was one claim that I recall that I handled

6    through the human resource -- through the Pennsylvania HR

7    Commission.

8    Q    And did that claim involve claims of discrimination?

9    A    Yes.

10   Q    In or around August of --

11   A    Oh, if -- may I just -- that involved a situation

12   regarding race.

13   Q    Okay.  In or around August of 2016, did you also complete

14   a senior professional and human resources certification

15   program?

16   A    August of '16?  I'm, I'm not certified at all through SHRM

17   or any other association.

18   Q    Did you ever pursue any such certification?

19   A    No.

20   Q    If you can turn to the exhibit that we've pre-marked as

21   Exhibit L?  This will be -- it's not tabbed.  It's just in the

22   back of the binder marked at the bottom corner as Exhibit L.

23   A    Yes, I have it.

24   Q    Do you recognize this document?

25   A    I, I do recognize some of the comments, yes.  The document

1   itself, to be honest, looks like many others in the same

2   context.

3   Q    And --

4   A    Format, I should say.

5   Q    Do you have any basis to dispute that this is not the

6   complaint filed on your behalf in connection with your lawsuit

7   against ECMF -- ECFMG?

8              THE COURT:  Dispute that this is not?

9              MS. MARTINEZ:  I'm trying to establish that this is

10  the complaint that he filed.

11             THE COURT:  Well, is this the complaint that you

12  filed in this lawsuit?

13             THE WITNESS:  It -- like I said, the language I'm

14  reading, it appears to be.

15             THE COURT:  Well, take a look at the signature line.

16             THE WITNESS:  Okay.

17  Q    Yes.  If you turn to the last page --

18  A    Okay.

19  Q    Is that your signature?

20  A    That's my signature.

21  Q    And it appears that you were verifying under the penalty

22  of perjury that the statements in the complaint, in the

23  preceding pages, were true and correct to the best of your

24  knowledge and information and belief.  Is that accurate?

25  A    Yes, yes.

1  Q     Did you actually type up the document that's been marked

2  as Exhibit L?

3  A     No.

4  Q     Did you review it before it was filed?

5  A     I really don't recall.

6  Q     As you sit here today, is there anything that you believe

7  in there that is not truthful or not accurate?

8  A     Could you repeat the question again, please?

9  Q     Sure.  As you are sitting here today, do you still believe

10 that everything in the complaint is truthful and correct?

11 A     In this document, yes.

12 Q     And if you turn to page four, paragraph 17, it references

13 a complaint of discrimination, age discrimination, that you

14 made to Sharon Roman Trowell.  Is that the complaint that you

15 referenced earlier in your testimony?

16 A     Yes, it is.

17 Q     Do you remember specifically when, in September of 2016,

18 you complained to Ms. Roman Trowell?

19 A     Well, I -- I'd have to go right to left.  I think -- well,

20 it was following the conference, number one, which I think

21 occurred on September 13th and 14th, or somewhere in the mid-

22 September.  It would have been upon my return.  So I'm going to

23 guess, not knowing when those days are, it would have been days

24 following that I went in and spoke to her.  She sat right next

25 to me.

1  Q    And during your conversation with Ms. Roman Trowell, did

2  you actually use the words "age discrimination?"

3  A    I probably did make a reference to it.  I really focused

4  on telling her what had happened at diner and the comments

5  that, that were made.  But I, I can't -- I can't sit here and

6  say that that term was not used by her or I.

7  Q    Did you tell Ms. Roman Trowell in that conversation or any

8  other conversation that you felt like you were being

9  discriminated against because of any medical condition that you

10  have?

11  A    No.  The purpose of that discussion was not related to any

12  disability or any other illness that I was -- that I -- that I

13  had.  It was my -- it was my comments to her -- again, I'm

14  recollecting.  My comments to her about, "You wouldn't believe

15  what she said to me at diner."  And, and then her comments back

16  to me.

17  Q    Did you ever complain to anyone else at ECFMG about

18  alleged discrimination or retaliation?

19  A    At me?

20  Q    Correct.

21  A    Or, or about me?  Not that -- not that I can recall.  I

22  usually kept those things pretty close to the vest.  You know,

23  I, I didn't even really come back and say anything to, to

24  Betty.  I -- when I was at diner with her and she asked me

25  that, I kind of hesitated and said, "Well, you know, gee."  And

1  then -- and then told her how old I was.  And then, you know,

2  but that, that was about it.

3  Q     And in this lawsuit you understand that you're raising

4  claims of age discrimination, disability discrimination, and

5  retaliation, correct?

6  A     Well, yes.  I understand that.

7  Q     When your employment with ECFMG ended, were you offered an

8  additional month of health insurance in exchange for signing a

9  release of claims?

10 A     Yes.

11 Q     And did you actually receive that release of claims from

12 ECFMG?

13 A     Yes.

14 Q     Do you remember if you received it on or about January 6th

15 of 2017?

16 A     It would have -- it would have been -- I don't think it

17 was that close to the term date but it would have been in that

18 time, in, in that -- in that framework.  In that framework,

19 yeah.

20 Q     Do you remember when you received it?

21 A     No.  I might have it.  I might have it in an email still

22 but no.  I -- it was before the -- after the 1st but before the

23 15th, I think is the best way I could window it for you.

24 Q     Did you review it with an attorney?

25 A     No.

1   Q    And you did not sign it, correct?

2   A    No, I didn't.

3   Q    Do you remember when you first contacted the Spielberger

4   Law Group?

5   A    It would have been late January of '17.

6   Q    Do you have a specific date?  I know you've already

7   testified as to when you retained them.

8   A    Yeah.

9   Q    But do you remember when you --

10  A    As, as I told my attorney, I think it was around the end

11  of the month but the 30th, 31st, or something like that, in

12  that -- in that -- again, I, I, I -- if I'm gonna -- you know,

13  having come out of a situation, my cognitive memory might be a

14  little bit off but I think it was around late January.

15  Q    Okay.

16  A    Okay?

17  Q    Were -- was the Spielberger Law Group the first law firm

18  that you spoke with about your claims against ECFMG?

19  A    Yes.

20  Q    If you could turn to the exhibit that we've pre-marked as

21  Exhibit M?  Again, this is not tabbed.  This appears at the

22  back of the binder.

23  A    Yes, I see this.

24  Q    Do you recognize this document?

25  A    I recognize the Spielberger logo and the date which is

1   late January.  So I'd have to say I somewhat recognize it.  I

2   mean not, not committed to memory but yes.

3   Q    And if you turn to the last page at the bottom --

4   A    Okay.

5   Q    It appears from the bottom that you were sent a copy of

6   this letter.  Is that correct?

7   A    Well, again, I'd have to -- I mean I'd have to see that

8   but if it says I'm copied I, I would have to say yes.  I guess

9   they did copy me on it.

10  Q    Do you remember if you reviewed this letter before it was

11  sent to ECFMG?

12  A    I can't recall.

13  Q    If you look at the first two paragraphs on the first page

14  of the letter --

15  A    Okay.

16  Q    Do you agree that they describe claims of alleged

17  harassment and discrimination based on the termination of your

18  employment with ECFMG?

19  A    What paragraphs are you referring to, please?

20  Q    The first few paragraphs on the first page of the letter.

21  A    Do I recall them?  Or, I'm sorry, I forgot your question.

22  Q    It's okay.  Do you agree that those paragraphs describe

23  claims of alleged harassment and discrimination, based on the

24  termination of your employment with ECFMG?

25  A    They really -- I mean I'm not -- the first two paragraphs

1   really don't say anything about that.  What -- I don't know

2   what I'm missing.  I -- the first paragraph says that I've

3   retained this law firm, and then the second paragraph says that

4   I'm a hard working employee.  So I'm not sure what it's -- what

5   your question is pertaining to.

6   Q    Sure.  Well, why don't you look through the first page of

7   the letter?

8   A    Okay.

9   Q    And let me know if you agree it's describing the claims

10  that you are purporting to bring against ECFMG.

11  A    So read -- I can read on?

12  Q    Oh, yes.

13  A    Okay.

14  Q    Absolutely.

15  A    Yes.

16  Q    And if you turn to the second page in the letter --

17  A    Mm-hmm.

18  Q    In the middle you'll see some italicized font.  And I'm

19  going to be directing you to the paragraph that's right below

20  that.  It begins with, "Mr. Voorhees seeks."  Do you see that?

21  A    "Mr. Voorhees seeks the following," yeah.

22  Q    And it, it follows that you were seeking a fair and

23  reasonable settlement for back wages, future wages,

24  nonpecuniary damages, benefits, and attorneys costs and fees.

25  Do you see that?

1  A    Yes.

2  Q    Is that what you were hoping to get from ECFMG by having

3  this letter sent to them?

4  A    I really -- I, I think there's a separation here of -- and

5  I'm not making an excuse for it but there was a situation that

6  occurred with me and Betty which precipitated my -- and I don't

7  know if this is related to the bankruptcy or not but it

8  precipitated my going out on disability on December 16th.  But

9  in terms of the letter as written, I know that I didn't edit

10 anything that the attorneys -- pretty much that anybody would

11 write, unless I thought there was a serious error, like age or

12 a date of employment, or something that I knew was just

13 inaccurate.  But when it came to legal writing, I pretty much

14 just let it go.  So I hope that answers your question.  If it

15 doesn't, please, please correct me.

16 Q    So, just to clarify, you understood when this letter was

17 being sent to ECFMG that there was a demand being made for

18 certain monetary payments?

19 A    Yes.

20 Q    How much money were you hoping to recover from ECFMG?

21 A    I had no idea.  I, I really had no, no idea.  All -- you

22 know, all I was -- I mean I, I -- you know, it's interesting.

23 In the 40 plus years I worked in HR and then the additional

24 time I worked as a consultant which was mostly comp and

25 benefits, I rarely sat on that part of the table which was part

1   of the negotiation.  What I mean by that is many employers had

2   different views of what a settlement, an equitable settlement

3   is.  I worked for an organization -- if I may digress just a

4   second -- called Omnicare Clinical Research.  And that CEO

5   said, "I'd rather spend $250,000 to win a case than $50,000 to

6   settle it."  Many others that I worked with would work with

7   attorneys and say, "Look, let's just let this calm down and,

8   and try to settle it."  So the language that's written here is

9   very general but I never worked -- I never got to the point

10  with Spielberger that they said, "Here's the number for me.

11  Here is what we're looking for."  Never got to that.  As a

12  matter of fact, the reason I left them after so many months and

13  went to Sidney Gold is because they were never available.  They

14  weren't -- they weren't here locally.  They were -- I think

15  they're located in Tampa, Florida.  And so, no, I had no idea.

16  I had no idea.  And I know that the attorney down there, I

17  believe his name is Jeff Turner [phonetic].  I believe that was

18  his name.  We never really talked.  The only time was, "Jeff,

19  I'm ending our relationship."  And he said -- and he said fine.

20  So I can't really answer your question about a number.

21  Q    Okay.

22  A    Does, does that help you?  Or does that answer?

23  Q    I, I understand.  I do have a follow-up question though.

24  I just want to go back.

25  A    Sure.

1  Q    Thank you for that explanation.  So from your experience

2  with Omnicare, you understood that sometimes employers are

3  willing to settle in lieu of litigating claims and pay a

4  monetary amount to the individual.  And sometimes individuals

5  will have to go through litigation and request -- and obtain a

6  judgment before they get a monetary amount.  Is that correct?

7  A    Mm-hmm.

8  Q    And so --

9  A    Or sometimes they get severed.  I mean there are so many

10 different situations where -- and, again, I started my career

11 at Squibb Corporation, which was later acquired by Bristol-

12 Meyers.  There were multiple, multiple, multiple layoffs there,

13 but every one of them involved a severance agreement.  And

14 every one of them that I had to defend for my client groups had

15 to be set before almost a tribunal of attorneys for review in

16 terms of class action, in terms of other demographics related

17 to age and gender, things like that.  So many different

18 circumstances.

19 Q    Understood.

20 A    I hope that helps.

21 Q    Do you remember when you stopped working with Spielberger

22 Law Group?

23 A    Yes.  Vaguely I can remember starting with them in January

24 and then -- well, I'm, I'm back -- I'm going right to left

25 again but I worked -- I started working or seeking out through

Voorhees - Cross/Martinez                    40

1   Avvo and Sidney Gold, founding -- finding Sidney Gold in

2   August.  So it was sometime in, I guess around that time period

3   that, you know, we were -- I was just trying to see where we

4   were.

5   Q    August of 2017?

6   A    Yes, mm-hmm.

7   Q    And so did you also meet with Sidney Gold and Associates

8   sometime around August of 2017 for the first time?

9   A    No.  Conversations, phone -- you mean face-to-face or any

10  kind of communication?

11  Q    Any kind of communication.

12  A    Oh, yes, mm-hmm.

13  Q    Had you talked to Sidney Gold and Associates any time

14  before August of 2017?

15  A    No.

16  Q    And other than Sidney --

17  A    No.  Sorry.

18  Q    Other than Sidney Gold and Associations and the

19  Spielberger Law Group, did you talk to any other attorneys

20  about your employment claims against ECFMG?

21  A    Oh, goodness.  No, not that I -- not that I recall.  I, I

22  was -- initially, I was kind of flying blind here.  It was

23  almost like it was back to the bankruptcy thing.  I -- you

24  know, you, you, you get -- and out of social media, whatever it

25  might be, you get pursued when you're in that much debt to

1   settle your debts and, and don't file for bankruptcy.  And

2   then, you know, I didn't like that, to tell you the truth.  It

3   just didn't seem right to me, or it didn't seem ethical for

4   some reason because they were charging me so much money.  So I

5   decided to seek counsel, to find out more about it.  It was the

6   same thing here.  When I did the Google search about

7   contingency law firms, Spielberger came up.  I didn't know

8   where they were and I had phone calls with them.  And they do

9   this interviewing process over the phone with you, and then

10  they pass you onto someone.  And so that's how the whole thing

11  happened.  When Spielberger kind of went off the grid with me

12  and didn't really communicate with me, I said maybe -- now I

13  know they're in Florida.  Maybe it's better to seek some

14  additional help from a firm that's savvy in, in Philadelphia,

15  somebody that would know the ins and outs better.  And that's

16  when I went to a more specific site, which was Avvo.  And

17  there's so many different types of searches you can do.

18  Q    Understood, understood.

19  A    All right, sorry.

20  Q    It's okay.  Can you turn to what's been pre-marked as

21  Exhibit J?

22  A    Yes, yes.

23  Q    Earlier you testified about filing a charge of

24  discrimination with the Pennsylvania Human Relations

25  Commission, and the Equal Employment Opportunity Commission.

1  Do you remember that testimony?

2  A    Yes.

3  Q    Is this, what's been marked as Exhibit J, the charge of

4  discrimination that was first filed with those agencies?

5  A    It looks like it, yes, the date from the time I worked

6  with Spielberger to the time the complaint was filed.

7  Q    And did you type up this document or did someone else?

8  A    Someone else typed it.

9  Q    And is that your signature that appears in the lower left-

10  hand corner?

11  A    Yes, it is.

12  Q    And it states, "I declare, under penalty of perjury, that

13  the above is true and correct."  Do you see that, right above

14  your signature?

15  A    Yes, I do see it.

16  Q    So does that mean you reviewed this document before it was

17  submitted to these agencies?

18  A    Yes, I probably did read it.  Yeah.

19  Q    It's not your normal habit to sign a document declaring

20  under the penalty of perjury that it's truthful and accurate

21  without reading it, is it?

22  A    Pretty much, yeah.  I pretty much read everything and,

23  like I said, as it relates to perjury I'm a little more careful

24  with it.  But, again, unless there's a significant flaw in the

25  -- in the document, like a date or, or age or event, that's

1   pretty much it.

2   Q    Now I'm going to ask you some questions about your

3   bankruptcy proceedings.  In your bankruptcy case, you were

4   represented by an attorney named Patricia Mayer.  Is that

5   correct?

6   A    Correct.

7   Q    And did Ms. Mayer continue to represent you during the

8   entire bankruptcy case?

9   A    Yes.

10  Q    And looking back at what's already been entered as Exhibit

11  B by your counsel --

12  A     --  Is that it?

13  Q    Exhibit B, as in boy.

14  A    Okay.

15  Q    It's in your binder.

16  A    So it's under the tab?

17  Q    Correct.

18  A    Okay.  Yes.

19  Q    If you could turn to the page marked 6 of 55?

20  A    Yes.

21  Q    At the bottom of the page, on the left-hand side, is that

22  your electronic signature?

23  A    Probably, yes, mm-hmm.

24  Q    And you were verifying under the penalty of perjury that

25  you had examined this petition and confirmed that the

1    information in it was true and correct?

2    A    Yes.

3    Q    And did you actually review this petition before it was

4    filed?

5    A    I read it.  I, I can't say I studied it, but I did -- I

6    did review it.

7    Q    And if you could turn to the page 10 of 55?

8    A    Sorry, wait a minute.  Let me -- it starts to repeat.

9    Q    So it will be right up at the top where it says

10   "document," and then page 10 of 55.

11   A    Oh, I'm sorry.  I was looking at the bottom.  Yes, I have

12   the page.

13   Q    And looking at the part where it says, "Schedule A/B:

14   Property," you see that?

15   A    I see the header, yes.

16   Q    The third sentence, it's actually the second line down --

17             THE COURT:  Where are -- where are you now?  What

18   page?

19             MS. MARTINEZ:  So 10 of 55, Your Honor.

20             THE COURT:  I, I see it.  Yes.

21             MS. MARTINEZ:  Okay.

22             THE COURT:  Schedule A/B: Property.

23             MS. MARTINEZ:  Correct.

24   A    Be, be as complete as possible?  Is that --

25   Q    Yep.  Do you see where it says, "Be as complete and

1    accurate as possible?"

2    A    Yes.

3    Q    Did you -- do you remember reading that instruction at the

4    time that you reviewed this petition?

5    A    I honest -- I'm assuming I did read it.

6    Q    Okay.

7    A    I don't recall date, time, and place, but I do remember --

8    I mean I see -- I see information on here that is mine with

9    relationship to my car.

10   Q    Did you ever tell Ms. Mayer about your complaint to Sharon

11   Roman Trowell?

12   A    Did I ever tell Patricia -- my bankruptcy attorney about

13   what I said to Sharon Roman Trowell?

14   Q    Correct.

15   A    No.

16   Q    Did you ever tell Ms. Mayer about the demand letter that

17   this Spieler --

18   A    Spielberger.

19   Q     -- Spielberger Law Group sent to ECFMG?

20   A    No, not to my knowledge.

21   Q    And did you ever tell Ms. Mayer about the charge of the

22   discrimination that you filed against ECFMG?

23   A    Well, wait a minute.  I'm -- at the time I met with

24   Patricia Mayer, there -- you know, there was no claim.  If I'm

25   getting my dates right, I met with -- I met with Patricia Mayer

1   in November, so I was still an employee.

2   Q    Understood.  You test --

3   A     --  I'm sorry, I'm -- if I'm confused, please correct me.

4   Q    Sure.  So you testified that you filed your petition in

5   November of 2016, correct?

6   A    Petition for?

7   Q    Bankruptcy.

8   A    The first one.

9   Q    Okay.  And that --

10  A    The Chapter 13 one is what you're referring to, I think.

11  Q    And then you filed -- it's what we're looking at as

12  Exhibit B.  This document was filed November 17th of 2016,

13  correct?

14  A    That's what the date is, yes.

15  Q    And at that time Ms. Mayer was your attorney in connection

16  with the bankruptcy proceedings?

17  A    That's correct.

18  Q    And you testified earlier, I believe, that your bankruptcy

19  proceedings ended February 27th of 2018.  Is that correct?

20  A    Well, I think there was -- there were some interim things

21  there.  I think the original filing was the 13.  And then I

22  think in January, after my status -- my employment status

23  changed, it was changed to a 7.  And then there was a hearing

24  to approve that in February.  And then I think the final-final

25  was April, if I'm not -- if I'm not mistaken here, to take care

1    of the -- take care of that petition under a 7.

2    Q    So April of 2017, that's when the bankruptcy court entered

3    the order of discharge, discharging your debts, correct?

4    A    That's my recollection, yes.

5    Q    And you were still represented by Ms. Mayer at that point,

6    correct?

7    A    That's correct.  Yes, I was.  She was there with me at the

8    hearing.

9    Q    Okay.

10   A    Or, or she was at the hearing with me in February, when it

11   was changed to a 7.  I only met with the trustee once.

12   Q    So the charge of discrimination that we just looked at was

13   date -- which for you is Exhibit J, is dated March 21st of

14   2017.

15   A    That sounds familiar.

16   Q    Which is before April 13th of 2017, correct?

17   A    Yes.

18   Q    So at the point that you filed the charge of

19   discrimination you were still represented by Ms. Mayer in the

20   bankruptcy proceedings, correct?

21   A    Yes.

22   Q    So my question is, did you ever tell Ms. Mayer about the

23   charge of discrimination that you filed against ECFMG.

24   A    No because -- no, I didn't.

25   Q    Okay.  Did you ever tell the attorneys at the Spiel Law

1   Group -- Spielberger Law Group about your bankruptcy

2   proceedings?

3   A     Hm-hmm, no.

4   Q     And I'm going to be very clear.  Before April 13th of 2017

5   --

6   A     Wait.  These dates are going to --

7   Q     Understood.

8   A      -- starting to confuse, but anyway.

9   Q     So you just testified that April 13th of 2017 is when the

10  bankruptcy court entered the order discharging your debts.  Do

11  you remember that?

12  A     I do.

13  Q     Okay.

14  A     May --

15  Q     So I want to be clear that my question's going to relate

16  to the timeframe -- the time before April 13th of 2017.

17  A     Yes.

18  Q     Did you tell any attorneys from Sid Gold and Associates

19  before April 13th of 2017 about your bankruptcy proceedings?

20  A     No.  Can -- may I -- is -- may I elaborate or is that --

21  Q     Sure.

22          THE COURT:  Yes.  The answer is yes.

23          THE WITNESS:  Okay.  Thank you, Your Honor.

24  A     There is -- there are -- there are dates that when I look

25  at the -- and, and when I looked at the bankruptcy and then

1  looked at the discrimination complaint, to me they were

2  distinct.  And what I -- what I mean by that is when I started

3  my discussions with Patricia Mayer I was still an employee of

4  ECFMG.  She asked me for documents in the current state,

5  whatever those documents might be.  I've mentioned them earlier

6  but there was no issue of, or no thought of, or no action in

7  place with regard to a discrimination complaint.  I was still

8  an employee and I -- and so it was never brought up.  Now, when

9  I lost my job, then of course the petition, according to my

10  attorney, needed to be changed, because it became an income

11  issue, to a 7.  And that was in '17, after I had lost my job,

12  but I really -- the only explanation I can give you is I was

13  really not an active participant and I wasn't asked to produce

14  anything.  She took the same document, amended it to include

15  that I had lost my job, is my take, and submitted it for the

16  trustee's approval.  So I -- that's the way I looked at it.

17  When it came time to engage or retain Sidney Gold, I looked at

18  it the -- I looked at bankruptcy as one thing and this as a --

19  as another, simply because I was never asked to provide any

20  additional documentation.  And the engagement of, of Patricia

21  Mayer at that time didn't involve any discrimination, so that's

22  kind of the way I looked at it.

23  Q    But you had, at the point that you retained Patricia

24  Mayer, made an internal complaint of alleged age discrimination

25  to Ms. Roman Trowell, correct?

1  A    Again, yes.  I had talked to her.  I, I don't want to make

2  it as formal as a complaint but you, you would have had to have

3  to have been in the office at the time when I -- when I told

4  her about it because there were other things.  And so it never

5  really from Sharon's perspective, because Sharon and Betty were

6  good friends, it was never a formal process complaint of,

7  "Here's a form.  Here's a letter.  Give me a statement.  I'm

8  going to investigate.  I'm going to corroborate.  I'm going to

9  get witnesses, etcetera."  It was nothing like that, so a

10 little bit different in my -- in my view.

11 Q    Okay.  But you --

12 A    Okay?

13 Q    You did frame it in this lawsuit as registering a

14 complaint of age discrimination?

15 A    Mm-hmm.  I'm saying yes, I did, mm-hmm.

16 Q    Okay.  If you could look at what has been marked as

17 Exhibit F?

18 A    Okay.

19 Q    It's under the tab.  Exhibit F, as in Frank.

20 A    Yes.  Yes, yes.

21 Q    Do you recognize this document as a letter that you

22 received from a legal assistant at Ms. Mayer's law firm?

23 A    Yes.

24 Q    And is the letter dated January 12th of 2017?

25 A    It is.

1  Q    Do you remember if this letter was delivered to you via

2  email, fax, or regular mail?

3  A    I don't recall but I'm, I'm not denying that I would have

4  received it.

5  Q    And did you read it at the time you received it?

6  A    Mm-hmm.

7  Q    And if --

8  A    Yes.

9  Q    If you look at the last sentence of the second paragraph -

10  -

11  A    We, beginning with "We?"

12  Q    Correct.  Where it says, "We will need information as to

13  the status of your employment claim?"

14  A    Unemployment claim.

15  Q    I'm sorry, unemployment claim.

16  A    Yes.

17  Q    Had you had a prior -- a discussion with Ms. Mayer prior

18  to January 12th about the termination of your employment with

19  ECFMG?

20  A    Prior to January 12th?

21  Q    Correct.

22  A    I probably did, just to let her know that my, my income

23  situation had dramatically changed.

24  Q    And where it says your unemployment claim, do you know if

25  that's a reference to a claim of discrimination that you had

Voorhees - Cross/Martinez                    52

1  against ECFMG?

2  A    No, that was just me trying to collect unemployment with,

3  with the Pennsylvania Unemployment Commission.  Yeah.  The one

4  thing I do remember about -- well, when I lost my job, it --

5  the first thing I needed to force myself to do, which was

6  fairly traumatic, was to sit down and file a claim for

7  unemployment.  And so I take from that sentence fairly certain

8  that she wanted to know what the status of the claim was, maybe

9  perhaps how much I was going to get per week, anything like

10 that.

11 Q    And in the unemployment claim proceedings did you

12 represent to anyone that you felt that you had been terminated

13 from your employment with ECFMG because of discriminatory

14 reasons?

15 A    No, no.  It was -- but I did produce, because this led me

16 down another path, I did produce -- I had to produce the letter

17 of termination, which Betty LaHue wrote to me.

18 Q    Okay.

19 A    Yeah.

20 Q    And, I'm sorry, I did have one last document.  I want to

21 make sure it gets into evidence.  Can you turn to --

22            THE COURT:  Before we leave this --

23            MS. MARTINEZ:  Sure.

24            THE COURT:   -- unemployment claim, did you actually

25 file an unemployment claim?

1          THE WITNESS:  Yes, sir.

2          THE COURT:  When?

3          THE WITNESS:  I don't know the exact date, Your

4    Honor, but it would have been in -- very soon after my

5    termination date to, to get -- to make sure I was getting some

6    kind of income.  I was living alone and had obligations.

7          THE COURT:  Do you -- do you have any documents to

8    evidence the filing of the unemployment claim?

9          THE WITNESS:  Well, I, I keep everything, Your Honor,

10   most everything.  So I could produce that.

11         THE COURT:  But you don't have them now?

12         THE WITNESS:  I don't have them with me, no.

13         THE COURT:  What was the result of the unemployment

14   claim?

15         THE WITNESS:  That's the additional point that I was

16   making.  I collected unemployment until I found new employment.

17   And now I'm, I'm going to be a little sketchy here but soon

18   after that I got a letter claiming that I owed the money back.

19   Okay?  And I have to get that letter.  And so I contested that,

20   that I was terminated, and here was my letter.  And so I went

21   before the unemployment commission with -- to a hearing, with a

22   hearing officer, and my termination was upheld and I was able

23   to keep, keep my unemployment compensation.  But I have

24   documents to that effect, Your Honor.

25         THE COURT:  Okay.

1             THE WITNESS:  If you need them, I'll provide them.

2   Does that help you?

3             MS. MARTINEZ:  Thank you, Your Honor.  Yes.

4             THE WITNESS:  Okay.

5             MS. MARTINEZ:  Thank you.

6             THE WITNESS:  Thank you.

7   Q    So the last exhibit that I wanted to make sure we got

8   entered was Exhibit N, as in Nancy.

9   A    Is that tabbed or un-tabbed?

10  Q    It's, it's not tabbed.

11  A    Not tabbed?  Okay.  Yes.

12  Q    Do you recognize this document as the final decree that

13  the bankruptcy court entered on February 27th of 2018, thereby

14  ending your bankruptcy case?

15  A    I recognize -- I'm sorry.  I recognize the, the judge's

16  name, Christine Gravelle.  And, yes, this looks correct to me.

17  Q    And as of February 27th of 2018, you had not disclosed

18  your claims against ECFMG to the bankruptcy court, even though

19  you had ongoing proceedings with the EEOC at that point?

20  A    No, I had not.

21  Q    Thank you.

22            MS. MARTINEZ:  I have nothing more, Your Honor.

23            THE COURT:  Is there any re-direct?

24            MS. FORD:  Just a brief re-direct, Your Honor.

25            THE COURT:  You may.

1    RE-DIRECT EXAMINATION

2    BY MS. FORD:

3    Q    Mr. Voorhees, on cross examination by counsel for the

4    Defendant you mentioned -- we talked a little bit about the

5    complaint that you made to Mr. Roman Trowell around September

6    of 2016.  Do you remember talking about that?

7    A    Mm-hmm, yes.

8    Q    Okay.  At that time, did you have some indication that

9    what Betty had said to you was perhaps wrong?

10   A    Betty?  Yes, I did.

11   Q    Okay.  And what was your purpose in going to Ms. Roman

12   Trowell at that point about what Betty had said to you?

13   A    I wanted it -- I wanted to tell someone in the role,

14   without going outside of my command.  In other words, not going

15   to the CEO or the C-suite, as we used to call it.  I wanted her

16   -- I wanted to put a date stamp that this had happened to me,

17   and so that I didn't forget it and she wouldn't forget it, you

18   know, that I would have another person that I could talk to.

19   And the person to talk to is the director of employee

20   relations.

21   Q    And at that point that you spoke with Ms. Roman Trowell,

22   were you contemplating filing a charge with the EEOC?

23   A    No, I wasn't.  I just wanted to -- you know, I just wanted

24   it documented.  It was something that I had trained employees

25   to do, as other counsel had mentioned, about writing policies,

1    procedures, non-retaliation, etcetera.  And so I was doing -- I

2    was doing the same thing.  I needed that job.  And,

3    interestingly, I, I really enjoyed working at ECFMG, but after

4    that point, after that conference all of a sudden there was

5    kind of a para -- there was a whole paradigm and environment

6    shift for me.  And I felt that I was becoming the butt of, of

7    her comments, and of course on December 16th she pretty much

8    exploded on me and, you know.

9    Q    Okay.

10   A    But, but yes.  I just wanted someone to know.  That was

11   all.

12   Q    Okay.  And, at that time that you spoke with Mr. Roman

13   Trowell, were you intending to continue your employment with

14   ECFMG?

15   A    Absolutely.  I think the context of my personal life comes

16   into play just for five seconds here is, you know, which I

17   still haven't done, is I was trying to put my life back

18   together.  And so, yes, I absolutely needed a -- needed that

19   employment if I was going to be able to do anything, including

20   overcoming this bankruptcy which I found out much more after it

21   was filed about the effects it has on your life than I did

22   before.

23   Q    And after your debts were discharged in April of 2017, did

24   you have any continuing conversations with your bankruptcy

25   counsel after that point?

1  A     No.

2  Q     And at any point after April of 2017 did your bankruptcy

3  counsel tell you that there had been any order entered in 2018,

4  closing the bankruptcy case?

5  A     I -- well, the way I can answer that is after -- please

6  forgive me again for dates, but after the bankruptcy hearing

7  amending the bankruptcy in February to a 7, and then getting

8  the subsequent petition filed in April, she sent me a form

9  letter which needed to go to each of the debtors.  And I don't

10  know what the name of that letter is but -- so I don't know if

11  I'm answering your question but that was about the only

12  communication I had with her.  I certainly haven't spoken to

13  her in many, many years.

14  Q     So my question, just to be more specific, we looked at an

15  exhibit marked Exhibit N.  It was the last exhibit we looked

16  at.

17  A     Yes.

18  Q     And that is a final decree that was entered on February

19  27th of 2018.  Do you see that?

20  A     Yes, I do.  Yes, I do.

21  Q     So between the order in April of 2017 and the entry of

22  this decree in February of 2018, do you recall having any

23  conversations with your bankruptcy counsel?

24  A     No.

25  Q     Okay.  And after your debts were discharged in April of

1  2017 was it your understanding that the bankruptcy case was

2  over?

3  A    Yes.

4  Q    Okay.

5            MS. FORD:  I have nothing further.

6            THE COURT:  I have just a few questions.

7            THE WITNESS:  Yes, sir.

8            THE COURT:  The discharge and bankruptcy came on

9  April 13th, 2017.

10            THE WITNESS:  Yes, sir.

11            THE COURT:  Before that --

12            THE WITNESS:   --  Yes, Your Honor, I mean.  Sorry.

13            THE COURT:  Before that, you had filed a claim of

14  discrimination against your employer.  Is that correct?

15            THE WITNESS:  Yes, it is.

16            THE COURT:  Did you recognize that this claim against

17  your employer was the sort of thing that would have had to have

18  been included in your initial bankruptcy petition filed in

19  2016, had it been in existence at that time?

20            THE WITNESS:  Had it been in existence?  Well, it was

21  the current state, as I said.  That's what my attorney --

22  that's what my attorney asked me for at the time, but yes.  It

23  would have --

24            THE COURT:   --  The current state in 2016?

25            THE WITNESS:  '16, yes.  Since I was still an

1   employee, it wasn't an issue.  But the answer is if I had been

2   asked that question to provide her with current state, that I

3   provided with the current state, and that would have been

4   included.

5          THE COURT:  Did you recognize that this claim against

6   your employer was an asset?

7          THE WITNESS:  No.

8          THE COURT:  You didn't think it was an asset?

9          THE WITNESS:  I still -- well, I think later down the

10  road, Your Honor, I recognized that the claims that were being

11  made were to repay for lost wages and things like that, but I

12  didn't necessarily consider it at that time.  Again, when I was

13  in the moment of 2016 meeting with her, it wasn't considered at

14  all.  If it had been --

15         THE COURT:  Meeting with who?  Your bankruptcy

16  lawyer?

17         THE WITNESS:  Yes.  If I would have told her anything

18  that she wanted anywhere, everything that I had that I could

19  give to her --

20         THE COURT:  Well, you knew about the discrimination

21  claim --

22         THE WITNESS:  Not, not --

23         THE COURT:   -- before -- let me finish.

24         THE WITNESS:  I'm sorry.  Sorry, Your Honor.

25         THE COURT:  Before your final discharge?

1          THE WITNESS:  Yes.  Yes, because I had engaged

2    Spielberger --

3          THE COURT:  The end of January of 2017.

4          THE WITNESS:  Yes, sir.  Yes, Your Honor.

5          THE COURT:  And did you not read the Spielberger

6    letter?  It's in, in evidence.  Let me get the -- that first --

7    that first bankruptcy --

8          THE WITNESS:  I don't -- is this M?

9          THE COURT:  No, it's the --

10          THE WITNESS:  Oh, the --

11          THE COURT:  Let me look.

12          THE WITNESS:  Okay.

13          THE COURT:  It's the letter from Spielberger to your

14    employer.  What's the exhibit number, Defense counsel?

15          MS. MARTINEZ:  I believe it's Exhibit --

16          MR. SEAN CAULFIELD:  Exhibit M.

17          MS. MARTINEZ:  M, as in Mary.

18          THE WITNESS:  Yeah.  It's dated January 31st, Your

19    Honor.

20          THE COURT:  Yes.

21          THE WITNESS:  Yes.

22          THE COURT:  What is the exhibit number of the

23    Spielberger letter in which the claims are detailed in a

24    general way?  And where what they are seeking is --

25          MS. MARTINEZ:  Sure.  Sure, Your Honor.  So in

1   Exhibit M it details the claims in the paragraph two to three

2   on the first page.  It describes the factual background and

3   then makes assertions about claims of disparate and

4   discriminatory treatment on the basis of his disability.

5               THE COURT:  And what -- Exhibit N, did you say?

6               MS. MARTINEZ:  Exhibit M, as in Mary.  It's a two-

7   page letter.

8               THE COURT:  Yes.

9               THE WITNESS:  Okay.

10              MS. MARTINEZ:  So the claims are described in

11  paragraphs two and three, and then the request for relief is on

12  the second page of that letter in the --

13              THE COURT:  Yes, I see it.  "In light of," yes.

14              MS. MARTINEZ:  Okay, yep.

15              THE COURT:  You knew as of the date of this

16  Spielberger letter to your employer, January 31st, 2017, that

17  Spielberger was seeking on your behalf, and I'll quote, "back

18  wages, future wages, nonpecuniary damages, benefits, attorneys

19  costs and fees."  And then there was reference to a positive

20  letter of reference.  Did you consider -- well, first of all,

21  did you read this Spielberger letter at or about the time it

22  was mailed?  Again, it's dated January 31st, 2017.  It's the

23  first letter you --

24              THE WITNESS:  Yes.

25              THE COURT:   -- got from Spielberger?

1              THE WITNESS:  I had.  Yes, Your Honor.  I, I --

2              THE COURT:  So you knew what they were --

3              THE WITNESS:  I recall it.  Yes.

4              THE COURT:  And you knew what they were claiming from

5    your employer.  Is that correct?

6              THE WITNESS:  Yes.

7              THE COURT:  Did you not consider what they were

8    claiming to be assets or potential assets?

9              THE WITNESS:  Your Honor, again, when I went to my

10   counsel -- it's not that I didn't consider it to be assets.  It

11   was the fact that I had already gone through the discovery

12   process with my bankruptcy attorney in 2016, prior to the

13   complaint, and that I was never asked to provide an amended

14   complaint.  I really -- I really honestly felt that the

15   complaint and the bankruptcy were separate -- were separate

16   issues.  I had disclosed to my attorney, Patricia Mayer at that

17   time, what she asked me to provide to her.  After that, the

18   initial meeting --

19             THE COURT:  Well, she asked you to provide her with

20   information on claims, and she reported there were none.  This

21   is in November of 2016.

22             THE WITNESS:  Correct.  And I didn't have any

23   discrimination claims at that --

24             THE COURT:  You didn't have any claims, according to

25   that bankruptcy petition.

1          THE WITNESS:  Right.

2          THE COURT:  The Chapter 13 petition.

3          THE WITNESS:  Correct.  I didn't.  I was still

4   employed.  It was after -- and then after that initial request

5   for documentation which I provided to her, as I said which

6   included a lot of different documents including the will issue,

7   we really -- and after the petition was completed with the

8   question about outstanding complaints, discriminating, whatever

9   it might have said --

10          THE COURT:  What petition?

11          THE WITNESS:  The bankruptcy petition.

12          THE COURT:  All right.

13          THE WITNESS:  That says check no if -- which was

14   checked no for other discrimination complaints and such, that

15   was true at the time.

16          THE COURT:  I, I don't know.  Was there a specific

17   question in that 55-page, 55-page bankruptcy petition on

18   discrimination claim?

19          MS. FORD:  Not discrimination explicitly.

20          THE COURT:  It's paragraph 33, isn't it?

21          MS. FORD:  It's -- yes, Your Honor.  It's claims

22   against any third parties.

23          THE COURT:  Yes.

24          MS. FORD:  It doesn't explicitly reference

25   discrimination.

1              THE COURT:  I didn't -- I didn't think so.

2              MS. MARTINEZ:  But Your Honor --

3              THE WITNESS:  Okay.  I'm sorry.

4              MS. MARTINEZ:  Your Honor, it does say employment

5    claims as an example.

6              THE COURT:  Oh.

7              MS. MARTINEZ:  So it says, "Claims against third

8    parties, whether or not you have filed a lawsuit or made a

9    demand for payment.  Examples, accidents, employment disputes,

10   insurance claims, or rights to sue."

11             THE COURT:  And that's paragraph 33 of Exhibit?

12             MS. MARTINEZ:  Exhibit B, Your Honor, page 13 of 55,

13   question 33.

14             THE COURT:  Paragraph 33 of the Chapter 13 petition

15   filed in November of 2016 reads -- and this is an inquiry

16   question.  "Claims against third parties, whether or not you

17   have filed a lawsuit or made a demand for payment."  And it

18   gives examples, accidents, employment disputes, insurance

19   claims, or rights to sue.  That question was answered no.  Did

20   you tell Ms. Mayer, your bankruptcy lawyer, that at that time

21   the answer to that question was no?

22             THE WITNESS:  Yes, I did.

23             THE COURT:  And did you not recognize that those

24   schedules appended to your Chapter 13 petition were going to be

25   relied upon with respect to your Chapter 7 petition?

1            THE WITNESS:  Yes, I did.

2            THE COURT:  And when you converted from a Chapter 13

3    bankruptcy petition to a Chapter 7, did you not know that the

4    answer -- did you not realize that the answer to paragraph 33,

5    or that question 33 was incorrect?

6            THE WITNESS:  By that time, Your Honor, again, I'm

7    going back to when the initial petition was filed, there was no

8    claim.  And --

9            THE COURT:  Well, the claim -- the statement was

10   true, apparently true --

11           THE WITNESS:  At that time.

12           THE COURT:   -- based on the evidence I've heard at

13   the time the initial Chapter 13 petition was filed.

14           THE WITNESS:  Right.

15           THE COURT:  In November, November 16th or 17th.

16           MS. FORD:  November 17th of 2016.

17           THE COURT:  January --

18           THE WITNESS:  2016.

19           THE COURT:  November 17th of January -- 2016.  But

20   that statement was not true when those same schedules were

21   relied upon in converting the Chapter 13 petition to a Chapter

22   7 petition.  Is that correct?

23           THE WITNESS:  Yes, that's correct.  But, again, if I

24   may?

25           THE COURT:  Yes.

1            THE WITNESS:  If I may?  The meeting I had with

2   Patricia Mayer -- and, you know, I'm telling you the absolute

3   truth here.  The meeting I had with Patricia Mayer was, "Give

4   me the current state."  It wasn't an ongoing process of --

5   first of all, revising from a 13 to a 7, I was really not even

6   involved in that.  That was a decision she made.  It wasn't

7   anything that we met on.  It wasn't anything that we really

8   even talked about.  It was a, a process that she followed based

9   upon my status at that time.  So I didn't think to, to tell

10  her.  And the documents that she had, had satisfied the

11  trustee, and I was not asked at any time to amend or did I need

12  to amend, or revise, or anything within, within the initial

13  petition.

14            THE COURT:  I'm looking at Exhibit C, which is

15  described as a motion to convert to Chapter 7.  The document is

16  actually entitled, "Certification of Debtor in Support of

17  Motion to Convert Case to a Chapter 7."  Were there any other

18  documents filed in or about that time -- the date here is

19  January 10th, 2017 -- regarding the conversion to a Chapter 7

20  proceeding?  Anyone know of any such dates?  Any such

21  documents?

22            MS. FORD:  Your Honor, the only other documents

23  relating to the conversation are reflected in Exhibit D and

24  Exhibit E.  And that was -- there's two orders from the

25  bankruptcy judge regarding that conversion, but that's the

1    extent of the documentation that I have.

2                MS. MARTINEZ:  Your Honor, we do --

3                THE COURT:  I'm looking -- I'm looking at Exhibit D,

4    which orders that amendments to previously filed schedules and

5    statements as necessary.  And that was a document dated January

6    11th, 2017.  Did your attorney ever ask you about amended

7    schedules?

8                THE WITNESS:  No.  No, Your Honor.  I'm not familiar

9    with this.

10               MS. MARTINEZ:  Your Honor, I'm sorry to interrupt but

11   I believe there are additional pages that were filed with the

12   motion to convert certification.  We have a full copy of that,

13   that filing.

14               THE COURT:  Well, I assume that you would have used

15   it if it advanced your position.  Well, there's another part of

16   that order.  I'm looking at Exhibit D.  The judge ordered

17   production of a schedule of all property which was acquired

18   after the commencement of the case but before the entry of this

19   order.  And, again, this is dated early in January, January

20   11th.  So there were no lawsuits at that time but you had been

21   term -- terminated.  All right.

22               What you're saying, in essence, is that you didn't

23   think it was necessary to say anything about the discrimination

24   suit in connection with the conversion of your Chapter 13

25   proceeding to a Chapter 7 proceeding, or before final discharge

1  in bankruptcy?

2          THE WITNESS:  I think, Your Honor, if I had a choice

3  of putting it in my words, I -- again, it's very similar to

4  trying to picture my meeting with Sharon Trowell about the word

5  "complaint" and what really happened.  When I met with Patricia

6  Mayer -- and please forgive me for repeating myself -- she did

7  have documents she wanted me to produce, and I produced them.

8  It wasn't that I met with Patricia Mayer every day or that we

9  communicated every day.  She handled that load and I was never

10  asked to provide revised information.  I wasn't asked and to be

11  honest with you I, I just followed her lead and followed her

12  stead, and, and that's, that's the way that it was proceeded.

13          THE COURT:  Thank you.

14          THE WITNESS:  And, and that's why on the initial

15  petition you see no, because it was no.  And that's why you

16  don't see revisions to it after, I guess it was March when the

17  complaint was filed for discrimination and, and then after

18  that.  So that -- that's, that's why those pieces fall into --

19          THE COURT:  Did you ever tell Ms. Mayer about the

20  filing of your discrimination complaint?

21          THE WITNESS:  No, no.  I only -- Your Honor, I only

22  had one meeting face-to-face with her other than the hearing.

23  She joined me.  And then after that it was emails where I would

24  get -- the only email that I -- that I got from her was the

25  copy of the discharge letter to the debtors.

1            THE COURT:  And the hearing was in January.  Am I

2    correct?

3            THE WITNESS:  I think it was February, mid-February.

4            THE COURT:  Well, it -- let me look.

5            THE WITNESS:  And then the --

6            THE COURT:  It looks like it was --

7            THE WITNESS:   -- petition was --

8            THE COURT:   -- February 6, 2017.

9            THE WITNESS:  Yeah.

10           THE COURT:  All right.  And my questions -- if my

11   questions have prompted any further questions from counsel, you

12   may ask them.  Plaintiff first, any further questions?

13           MS. FORD:  No further questions, Your Honor.

14           THE COURT:  Defense?

15           MS. MARTINEZ:  No further questions, Your Honor.

16           THE COURT:  Fine.  You may step down.

17           THE WITNESS:  Thank you, Your Honor.

18           THE COURT:  Your testimony is completed.  I think

19   I'll hear very brief argument from Defense.  You spent a lot of

20   time questioning Mr. Voorhees and I'd like to know where you

21   think it got you.

22           MS. MARTINEZ:  Sure, Your Honor.  Should I approach

23   the podium?

24           THE COURT:  Yes.

25           MS. MARTINEZ:  Your Honor, if it may please the

1  Court, what we've heard testimony today on establishes that

2  this is an individual who is well aware about anti-

3  discrimination laws, the ability to file claims, the fact that

4  such claims might result in receipt of monetary payment whether

5  through settlement or through judgement.  That he was aware as

6  of September 2016 that he believed he had been subjected to age

7  based harassment or discrimination, however --

8              THE COURT:  Well, he said he was looking for

9  guidance.  He said he wasn't making a complaint.

10             MS. MARTINEZ:  He still had raised claims that he

11  said he might have used the term "age discrimination" within

12  the context of that conversation, which I believe demonstrates

13  that -- a knowledge of a potential claim even if he hadn't at

14  that point necessarily contemplated necessarily filing that

15  claim.  And that at the time -- and that he was aware of that

16  before he even filed the bankruptcy petition.

17             And the case law clearly establishes that there is an

18  ongoing obligation to amend disclosures as the case proceeds.

19  That's apparent from language that's used in the petition but

20  also in the amended disclosures and schedules that he did file,

21  that we looked at today.

22             THE COURT:  Well, exactly what amended disclosure do

23  you think was inaccurate?  More -- from your perspective, it

24  would be more than inaccurate, which was fraudulently executed.

25             MS. MARTINEZ:  That even in the amended -- when the

1  disclosure was amended to declare that there was no monthly

2  income because of the loss of employment, that amended

3  disclosure was filed on January 26th of 2017, and entered as an

4  exhibit today.  There was a -- there was a section that says,

5  "Schedule A/B, list the value of the claims," and it remained

6  as zero, just as it -- as it had in the initial petition.  So

7  it was not disclosed at that point even though at the time that

8  that amended disclosure was filed he had already -- his

9  employment had already been terminated.

10         THE COURT:  But he hadn't gone to the lawyer until

11 the end of that month, January 31st.

12         MS. MARTINEZ:  Correct, but fair -- that's fair, Your

13 Honor.  Even still, there was -- there was opportunity at time

14 between then and when the proceedings ended in February of

15 2018, or even if you want to look at when the dis -- the debts

16 were discharged in April of 2017, where those claims could have

17 been disclosed.  A demand letter had already been sent; the

18 charge been filed.

19         THE COURT:  What question asked specifically -- I'm

20 talking about the bankruptcy documents.  What question

21 specifically asked for changes in, in claims?  And what was the

22 date of the document?

23         MS. MARTINEZ:  So the petition itself asks for it to

24 be full and complete.

25         THE COURT:  The petition was filed in November of

1  2016.

2          MS. MARTINEZ:  Correct.

3          THE COURT:  Yeah.

4          MS. MARTINEZ:  And --

5          THE COURT:  Let's go forward.

6          MS. MARTINEZ:  Sure.

7          THE COURT:  After he was terminated and after he

8  began thinking of filing a claim, the first -- the first claim

9  -- well, I'm looking at the first time a claim was asserted,

10 and I think it was that January 31st, 2017, letter from the law

11 firm.

12          MS. MARTINEZ:  Correct, Your Honor.

13          THE COURT:  After that claim was made, what if any

14 documents were executed that you say were false?

15          MS. MARTINEZ:  It's not that it was executed -- that

16 they're executed that was false, but there was no supplemental

17 filing after that date.

18          THE COURT:  Where is the document that says you must

19 supplement?

20          MS. MARTINEZ:  I think it's implied through the

21 language used throughout the petition and an instruction that

22 would have been given to him by his bankruptcy counsel.

23          THE COURT:  Would have?  We're not going to "would

24 have's."  If, if it were given, that's one thing, but there's

25 no evidence that it was given.  The -- you're going back to --

1    I think it's paragraph 33, and is there anything in that

2    paragraph or the preamble to those paragraphs that says there's

3    an ongoing duty to update?

4              MS. MARTINEZ:  It does reference check if this an

5    amended filing.

6              THE COURT:  Where?  Where is that?

7              MS. MARTINEZ:  On page 10 of 55.

8              THE COURT:  I don't -- I'm not there.

9              MS. MARTINEZ:  On the upper right-hand corner.

10             THE COURT:  Okay.  I see that but I don't see a duty

11   expressed in writing to amend.  You tell if I'm -- I miss

12   something.

13             MS. MARTINEZ:  I don't think in this particular

14   document, Your Honor, that there is a specific instruction,

15   other than stating to be as complete and accurate as possible.

16             THE COURT:  Well, it --

17             MS. MARTINEZ:  And to make sure that you answer every

18   question.

19             THE COURT:  Well, that was done, apparently, in 2016,

20   when it was executed.

21             MS. MARTINEZ:  And we know from --

22             THE COURT:  But it wasn't -- it wasn't updated and

23   that's what I'm focusing on.

24             MS. MARTINEZ:  There is also an obligation -- as

25   established by the case law, that there is an ongoing

1   obligation to amend that we briefed in our papers, our motion

2   to dismiss papers.

3          THE COURT:  All right.  Is there anything else you

4   want to say?

5          MS. MARTINEZ:  There is a rebuttable inference of

6   bad, bad faith when there is knowledge of a potential claim

7   before the closure of the bankruptcy proceedings, which here we

8   have established that there was based on the filing of -- or

9   the submission of the demand letter and the EEOC charge.  And a

10  motive to conceal, which case law again cited in our papers

11  establishes exists where there is a potential to recover

12  monetary damages through the -- through the filing of a lawsuit

13  that have not been disclosed in the bankruptcy proceeding.  So

14  if they're disclosed in the bankruptcy proceedings there's a

15  possibility that the individual themselves might not obtain

16  that monetary relief but instead it would be reward -- awarded

17  to the creditors.  And then, if it's not disclosed however,

18  they then have an opportunity to keep that money for

19  themselves.

20         And I believe the testimony today established that he

21  was aware through his experience in HR, prior involvement in

22  cases, and his attorney demand letter, that he had knowledge

23  that there was a monetary value to his claims.  So under the

24  case law that we -- that we have cited and relied upon, we

25  believe that that inference has been established.

1          We also believe that the applicable and binding case

2   law establishes that it's not simply enough to rely on the

3   advice of counsel or to claim that you're a simple layman who

4   doesn't understand the intricacies of bankruptcy, bankruptcy

5   law.  And that that -- there have still been decisions where

6   courts have granted motions to dismiss where plaintiffs have

7   tried to rely on the reliance of counsel.  One of those cases

8   was the Messenger versus Prudential Insurance case that we

9   cited.

10          Here, it's particularly telling that he was

11  represented by multiple law firms and had multiple

12  opportunities to receive advice.  I think that similar to the

13  case you presided --

14          THE COURT:  Well, if he got advice that's one thing,

15  but you can't say that multiple law firms and argue that

16  multiple opportunities to receive advice.  He could have asked

17  questions but he said it never occurred to him.  I'm going to

18  read the cases, particularly my colleague Judge Robreno's case.

19  I -- I'm referring to Bartower [phonetic].

20          MS. MARTINEZ:  And, Your Honor, I believe that you

21  found in the Hardy versus Care -- Hardy Carrere [phonetic]

22  versus Schrier [phonetic] Pharmaceuticals that it was telling

23  that the plaintiff in that case, like here, had filed an

24  amended schedule in her bankruptcy proceedings but failed to

25  identify in that amended schedule the discrimination case that

 1  she had.

 2          THE COURT:  That's a different case.

 3          MS. MARTINEZ:  Understood, Your Honor.

 4          THE COURT:  Mr. Voorhees says he never understood

 5  that he had to file an amended schedule or that it was

 6  required.

 7          MS. MARTINEZ:  And with all due respect, Your Honor,

 8  and obviously you know the Hardy Carrere case better than I do,

 9  but I did not see in the decisions or the papers that were

10  filed an indication that the plaintiff in that case had

11  received such an instruction from her bankruptcy counsel.

12          THE COURT:  Well, she filed or an amended schedule

13  was filed in that case, and the amended schedule did not

14  include something that was supposed to be included.  That's

15  different.

16          MS. MARTINEZ:  Well, here, he filed an amended

17  schedule as well, Your Honor.

18          THE COURT:  The amended schedule was limited to -- I

19  thought that schedule was limited just to income.  Let's turn

20  to that one.  I asked a question about that.  That's where his

21  income was reduced on the schedule to zero.  What exhibit is

22  that?

23          MS. MARTINEZ:  Exhibit H, Your Honor.

24          THE COURT:  There is nothing on here that I see

25  relating to anything other than income.

1          MS. MARTINEZ:  Your Honor, if you --

2          THE COURT:  And then on page three there's an

3    overarching declaration about schedules.

4          MS. MARTINEZ:  There is actually a line on the fourth

5    page of this exhibit, Your Honor.

6          THE COURT:  You didn't refer to this at all in your

7    questioning.

8          MS. MARTINEZ:  I understood because he acknowledged

9    that this was a form that he had reviewed and that it was

10   accurate.

11         THE COURT:  What line are you referring to on the

12   fourth page?

13         MS. MARTINEZ:  Line one, Schedule A/B: Property.  And

14   1-A right below it that lists the value of Schedule A/B as

15   being zero.

16         THE COURT:  Who submitted this form?  I know it was

17   submitted on his behalf.  I don't see a signature line.  Is

18   this the complete form?

19         MS. MARTINEZ:  Correct, Your Honor.  And I can tell

20   that because it's 17 and 17-1, indicating that it was an

21   attachment to docket entry 17, at the top of the page.

22         THE COURT:  The date -- what is the date of this

23   document?

24         MS. MARTINEZ:  January 26th of 2017.

25         THE COURT:  Yes, I see it at the top now.  Well, he

1  wasn't -- Mr. Voorhees wasn't asked when he began thinking

2  about a claim.  The first evidence of a claim is dated, as I

3  said, January 31st, which is after this document.  All right.

4  Anything else on that question I asked you?

5              MS. MARTINEZ:  No, Your Honor.

6              THE COURT:  Thank you.  I'll hear briefly from the

7  Plaintiff.

8              MS. FORD:  Your Honor, as laid out in Plaintiff's

9  response to the motion to dismiss, judicial estoppel is an

10  extremely extraordinary remedy, and it's not to be taken

11  lightly.  And one element that's very important is bad faith.

12  That's what we're here today to determine, is whether Mr.

13  Voorhees had bad faith in his bankruptcy case by not disclosing

14  this claim.

15              I think that the testimony today overwhelmingly

16  demonstrates that Mr. Voorhees had absolutely no bad faith.

17  This was quite simply in its most basic form a mistake.  He

18  originally filled out the schedules with assistance of

19  bankruptcy counsel prior to even being terminated from his

20  employment.  At that point, he had no knowledge whatsoever, as

21  you heard him testify today, that there was any possibility of

22  a claim.  So when he filled out that bankruptcy petition and

23  checked no for whether he had any pending claims, that was 100%

24  the truth.

25              Following his termination from his employment, there

1    were amended schedules filed.  If you turn to the Exhibit H,

2    the amended schedules, and you look at the fourth page that

3    Defense counsel was just referring to, you'll see that part

4    one, the first question, 1-A is asking for real estate, which

5    he has none.  So the answer to that would be no.  Line 1-B

6    would be personal property, which would be all of the property

7    that was originally --

8              THE COURT:  Wait a minute.  What page are you on of

9    this exhibit?

10             MS. FORD:  I'm on page four of the amended schedule

11   of Exhibit H.

12             THE COURT:  All right.  I see it.

13             MS. FORD:  And at no point in this amended schedule

14   is there a question that explicitly asked Mr. Voorhees do you

15   have any pending claims.  Now, even if it had though, Your

16   Honor, as if this time, this was completed on January 26th of

17   2017.  The testimony today has shown that he didn't send any

18   kind of demand letter until after that, until the end of

19   January, January 31st.  You also heard Mr. Voorhees testify

20   that had he known of an obligation to supplement these

21   disclosures he absolutely would have done so.  In fact, you

22   heard him testify that he did include additional information at

23   the hearing as to his father's estate.  There was no intention

24   by Mr. Voorhees whatsoever here to mislead the bankruptcy court

25   or hide any of his assets.

1          As you heard Mr. Voorhees testify, he viewed these

2  claims separately.  And had his bankruptcy counsel advised him

3  that he needed to disclose any kind of employment

4  discrimination claims or supplement these schedules in any way,

5  you heard Mr. Voorhees say that he absolutely would have.

6          This is a situation, Your Honor, that the Defense

7  can't show bad faith because there wasn't any.  Mr. Voorhees

8  was going through a bankruptcy procedure.  He got terminated in

9  the midst of it and he was doing the best that he could under

10 the circumstances.

11         THE COURT:  Well, the Defense has the benefit of an

12 inference in this case.  Orion [phonetic], which you cited,

13 states that the combination of knowledge of the claim, and he

14 knew that, and a motive for concealment in the face of an

15 affirmative duty to disclose may give rise to an inference of

16 intent sufficient to satisfy the requirements of judicial

17 estoppel.  Because of this rebuttal inference of bad faith,

18 courts have typically held that defendants need not show direct

19 evidence of bad faith or intentional wrongdoing.

20         MS. FORD:  Correct, Your Honor.  And the key word

21 from Plaintiff's perspective in there is "may."  It may create

22 a rebuttable inference.

23         THE COURT:  Correct.

24         MS. FORD:  We -- I would argue here that even that

25 standard hasn't been met because even though there admittedly

1   was a claim that wasn't disclosed, there hasn't been any

2   evidence presented that Mr. Voorhees had any knowledge

3   whatsoever of any obligation that he do so.  This isn't a

4   situation where Mr. Voorhees was on the stand and he admitted,

5   you know, "I knew I should have done it but I didn't."  That's

6   not this case.

7            This case is a situation where not only is there no

8   direct evidence of bad faith, there's no evidence whatsoever of

9   bad faith.  In fact, Mr. Voorhees' testimony was consistent

10  that he tried to do everything right here.  He was relying on

11  his counsel.  He was relying on his understanding of what he

12  was supposed to be doing.  And, importantly, at the time that

13  those amended schedules were filed, he hadn't even asserted his

14  claim yet.  There is just no evidence here.  Even if there was

15  a rebuttable inference, I think that we've rebutted it with Mr.

16  Voorhees' testimony today.

17           THE COURT:  All right.  I thank you.  I thank you

18  both.

19           MS. FORD:  Thank Your Honor.

20           THE COURT:  We'll take the issue under advisement.  I

21  want to thank you all.  It's been a long afternoon but this is

22  -- this is the way a court, I think, should proceed in a matter

23  like this.  A hearing is absolutely necessary.  We've had one.

24  I've let counsel explore the depths of lots of documents, some

25  of which were more relevant than others.  And I think I have an

1  understanding now of what happened.  And we'll rule as quickly

2  as we can.  On that note, court is adjourned.  Thank you all

3  very much.

4          MS. FORD:  Thank Your Honor.

5          MS. MARTINEZ:  Thank Your Honor.

6          COURTROOM DEPUTY:  All rise.

7          THE COURT:  You may go about your business, everyone.

8                        *  *  *  *  *

## C E R T I F I C A T I O N

I, Brandi Chamberlain, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

_____

DATE:  March 4, 2020